**ORAL ARGUMENT NOT YET SCHEDULED**

No. 23-1157 and consolidated cases

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

STATE OF UTAH,

*Petitioner*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
and MICHAEL S. REGAN, Administrator, U.S. EPA,

*Respondents*.

---

# PROOF OPENING BRIEF OF PETITIONER-INTERVENOR SIERRA CLUB

Zachary M. Fabish
Sierra Club
50 F Street NW, 8th Floor
Washington, DC 20001
650-388-8446
zachary.fabish@sierraclub.org

Joshua D. Smith
Sierra Club
2101 Webster Street, Suite 1300
Oakland, California 94612
415-977-5560
joshua.smith@sierraclub.org

*Counsel for Sierra Club*

Neil Gormley
Kathleen Riley
Seth L. Johnson
Earthjustice
1001 G Street NW, Suite 1000
Washington, DC 20001
202-797-5239
202-745-5227
202-797-5245
ngormley@earthjustice.org
kriley@earthjustice.org
sjohnson@earthjustice.org

*Counsel for Sierra Club*

Filed: August 22, 2023

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1)(A), Petitioner-Intervenor Sierra Club submits this certificate as to parties, rulings, and related cases.

### I. Parties

Petitioners: State of Wisconsin (No. 23-1201); State of Utah (lead case No. 23-1157); Kinder Morgan, Inc. (No. 23-1181); States of Ohio, Indiana, and West Virginia (No. 23-1183); American Forest & Paper Association (No. 23-1190); Midwest Ozone Group (No. 23-1191); Interstate Natural Gas Association of America and American Petroleum Institute (No. 23-1193); Associated Electric Cooperative Inc., Ohio Valley Electric Corporation, America's Power, Deseret Generation & Transmission Co-Operative, National Rural Electric Cooperative Association, Portland Cement Association, and Wabash Valley Power Association, Inc. (No. 23-1195); National Mining Association (No. 23-1199); American Iron and Steel Institute (No. 23-1200); Enbridge (U.S.) Inc. (23-1202); American Fuel & Petrochemical Manufacturers and American Chemistry Council (No. 23-1203); TransCanada Pipeline USA Ltd. (No. 23-1205); Hybar LLC (No. 23-1206); United States Steel Corporation (No. 23-1207); Union Electric Company (No. 23-1208); State of Nevada (No. 23-1209); Arkansas League of Good Neighbors (No. 23-1211); Energy Transfer L.P. (No. 23-1306, -1307, -1316); Commonwealth of Kentucky Energy and Environment Cabinet (No. 23-1314); Commonwealth of

Kentucky (No. 23-1315); Buckeye Power, Inc., Ohio Valley Electric Corporation (No. 23-1317).

Respondents: U. S. Environmental Protection Agency; Michael S. Regan, Administrator of the U.S. Environmental Protection Agency.

Intervenors for Petitioners: Sierra Club (as to No. 23-1201); City Utilities of Springfield, Missouri (as to lead case No. 23-1157).

Intervenors for Respondents: Midwest Ozone Group (as to No. 23-1201); Sierra Club, Chesapeake Bay Foundation; Environmental Defense Fund; Citizens for Pennsylvania's Future; Clean Air Council; Clean Wisconsin; Air Alliance Houston; Appalachian Mountain Club; Center for Biological Diversity; Downwinders at Risk; Louisiana Environmental Action Network; Southern Utah Wilderness Alliance; Utah Physicians for a Healthy Environment (all as to lead case No. 23-1157); City of New York; Commonwealth of Massachusetts; Commonwealth of Pennsylvania; District of Columbia; Harris County, Texas; State of Connecticut; State of Delaware; State of Illinois; State of Maryland; State of New Jersey; State of New York; and State of Wisconsin (all as to lead case No. 23-1157).

Amici Curiae in Support of Petitioners: American Exploration and Production Council; The Chamber of Commerce of the United States of America;

Sen. Shelley Moore Capito and Roger F. Wicker, Rep. Cathy McMorris Rodgers, and 44 Members of Congress (all as to lead case No. 23-1157).

## II. Ruling Under Review

"Federal 'Good Neighbor Plan' for the 2015 Ozone National Ambient Air Quality Standards," published in the Federal Register at 88 FR 36,654 (June 5, 2023) (EPA Docket No. EPA-HQ-OAR-2021-0668).

## III. Related Cases

In the Fifth Circuit:

- 23-60300, *Texas et al. v. EPA*

In the Eighth Circuit:

- No. 23-2769, *Arkansas et al. v. EPA*
- No. 23-2771, *Missouri v. EPA*
- No. 23-2773, *Energy Transfer LP v. EPA*
- No. 23-2774, *Energy Transfer LP v. EPA*
- No. 23-2782, *Hybar LLC v. EPA*
- No. 23-2786, *Union Electric Company v. EPA*
- No. 23-2789, *Allete, Inc. v EPA*

In the Ninth Circuit:

- No. 23-1098, *Nevada Cement Co. LLC v. EPA*

In the Tenth Circuit:

- No. 23-9551, *Tulsa Cement v. EPA*
- No. 23-9557, *PacifiCorp et al. v. EPA*
- No. 23-9561, *Oklahoma v. EPA*
- No. 23-9569, *Energy Transfer LP v. EPA*

In the Eleventh Circuit:

- No. 23-12528, *Alabama et al. v. EPA*

Dated: April 22, 2024

*/s/ Neil Gormley*
Neil Gormley

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Circuit Rule 26.1, Petitioner-Intervenor Sierra Club states it is a national non-profit organization dedicated to the protection and enjoyment of the environment; no publicly held corporation owns any stock in Sierra Club; and Sierra Club has no parent corporations.

Dated: April 22, 2024

*<u>/s/ Neil Gormley</u>*
Neil Gormley

# TABLE OF CONTENTS


INTRODUCTION .......... 1

JURISDICTIONAL STATEMENT .......... 2

STATUTES AND REGULATIONS .......... 2

ISSUE PRESENTED .......... 2

STATEMENT OF THE CASE .......... 2

I. STATUTORY BACKGROUND. .......... 2

II. PROCEDURAL BACKGROUND. .......... 8

A. Cross-state Pollution Contributes to Violations of the Ozone Standard in Downwind States. .......... 8

B. EPA's Proposed Rule Identifies Downwind Locations That Will Struggle With Elevated Ozone Levels Due to Cross-state Pollution and Fails to Prohibit Sufficient Pollution. .......... 11

C. EPA's Final Rule Does Not Address Or Fix the Undercontrol. .......... 15

SUMMARY OF ARGUMENT .......... 27

STANDING .......... 28

STANDARD OF REVIEW .......... 29

ARGUMENT .......... 30

I. THE RULE VIOLATES THE CLEAN AIR ACT AND IS ARBITRARY BECAUSE IT UNDERCONTROLS CROSS-STATE POLLUTION FROM ILLINOIS, INDIANA, MICHIGAN, MISSOURI, OHIO, AND TEXAS. .......... 30

A. Pollution from These Six States Will Still Significantly Contribute to Nonattainment and Interfere with Maintenance Even After Implementation of All Controls. .......... 30

B. This Undercontrol of Cross-state Pollution Violates the Act .......... 31

C. EPA Unreasonably and Arbitrarily Failed to Heed the Statutory Mandate to Avoid Undercontrol. .......... 34

D. Compliance with the Act is Not "Impossible." .......... 36

II. THE RULE SHOULD BE REMANDED TO EPA WITHOUT VACATUR. .......... 37

CONCLUSION .......... 39

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Am. Hosp. Ass'n v. Price*,
867 F.3d 160 (D.C. Cir. 2017)........................................................37

*Bluewater Network v. EPA*,
370 F.3d 1 (D.C. Cir. 2004)..........................................................29

*Delaney v. EPA*,
898 F.2d 687 (9th Cir. 1990)........................................................39

*Downwinders at Risk v. EPA*,
No. 4-21-cv-3551 (N.D. Cal. May 12, 2021)...................................10

* *EME Homer City Generation, L.P. v. EPA*,
795 F.3d 118 (D.C. Cir. 2015)........................................................39

*Env't Def. Fund, Inc. v. EPA*,
898 F.2d 183 (D.C. Cir. 1990)........................................................38

* *EPA v. EME Homer City Generation, L.P.*,
572 U.S. 489 (2014)................................................ 5, 6, 7, 14, 27, 32, 33

*Friends of the Earth, Inc. v. Laidlaw Env't. Serv. (TOC), Inc.*,
528 U.S. 167 (2000)........................................................................28

*Mountain Commc'ns, Inc. v. FCC*,
355 F.3d 644 (D.C. Cir. 2004)........................................................35

*Nat. Res. Def. Council v. EPA*,
777 F.3d 456 (D.C. Cir. 2014)..........................................................4

*Nat'l Ass'n of Clean Water Agencies v. EPA*,
734 F.3d 1115 (D.C. Cir. 2013)......................................................36

*North Carolina v. EPA*,
531 F.3d 896 (D.C. Cir. 2008)........................................................29

*North Carolina v. EPA*,
550 F.3d 1176 (D.C. Cir. 2008)......................................................37

* *Authorities upon which we chiefly rely are marked with asterisks.*

*Rettig v. Pension Ben. Guar. Corp.*,
744 F.2d 133 (D.C. Cir. 1984)....................29, 35

*Sherley v. Sebelius*,
689 F.3d 776 (D.C. Cir. 2012)....................36

*Sierra Club v. EPA*,
294 F.3d 155 (D.C. Cir. 2002)....................32

*Sierra Club v. EPA*,
699 F.3d 530 (D.C. Cir. 2012)....................29

*South Coast Air Quality Mgmt. Dist. v. EPA*,
472 F.3d 882 (D.C. Cir. 2006)....................6

*Train v. Nat. Res. Def. Council, Inc.*,
421 U.S. 60 (1975)....................5, 32, 34

* *Wisconsin v. EPA*,
938 F.3d 303 (D.C. Cir. 2019).................... 4, 7, 14, 27, 32, 34, 35, 36, 37, 38, 39

**Statutes**

42 U.S.C. § 7407(d)....................4

42 U.S.C. § 7408....................3

42 U.S.C. § 7408(a)(2)....................4

42 U.S.C. § 7409....................3

42 U.S.C. § 7409(d)....................4

* 42 U.S.C. § 7410(a).................... 1, 6, 14, 27, 31, 32, 33, 34

42 U.S.C. § 7410(c)(1)....................10

42 U.S.C. § 7511(a)....................4, 5, 32, 39

42 U.S.C. § 7607(b)....................2

42 U.S.C. § 7607(d)(9)(A)....................29

**Federal Register Notices**

80 FR 65,292 (Oct. 26, 2015) ....................4, 11

84 FR 66,612 (Dec. 5, 2019)....................10

87 FR 20,036 (April 6, 2022)....................11

88 FR 9336 (Feb. 13, 2023)....................10

88 FR 36,654 (June 5, 2023)....................1, 2

## INTRODUCTION

Though the Environmental Protection Agency set the current standard for ground-level ozone pollution nearly nine years ago, 139 million Americans breathe air that still fails those standards. That dirty air exposes these people to elevated risks of asthma, lung and cardiovascular disease, and premature death. This result is largely due to EPA's failure to fully meet its statutory duty to ensure that ozone pollution that drifts across state lines and elevates ozone levels in downwind states is sufficiently controlled.

The Clean Air Act requires EPA to prohibit states from emitting pollution that contributes significantly to violations of, or interferes with compliance with, the ozone standard in other states. 42 U.S.C. § 7410(a)(2)(D). To that end, EPA issued the Good Neighbor Rule, which requires twenty-one states to reduce harmful nitrogen oxide emissions that contribute to elevated ozone levels downwind. 88 FR 36,654 (June 5, 2023), JA___. As Wisconsin explains, however, the rule does not prohibit enough pollution from states upwind of Wisconsin. Indeed, EPA's own projections show that under its rule, emissions from six states—Illinois, Indiana, Michigan, Missouri, Ohio, and Texas—will continue to interfere with Wisconsin's (and other states') ability to meet the ozone standard. Worse, EPA admits that those projections understate the ozone levels that those downwind states will actually see. Nor did EPA show that greater pollution control

was impossible or justify its failure to abide by the statute when commenters raised it before the agency.

For these reasons, this Court should remand the rule without vacatur and direct EPA to expeditiously promulgate a revised rule that complies with the Act.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 42 U.S.C. § 7607(b)(1)-(2) to review the final action taken by EPA at 88 FR 36,654 (June 5, 2023), JA___, entitled "Federal 'Good Neighbor Plan' for the 2015 Ozone National Ambient Air Quality Standards." Sierra Club intervened as a petitioner in support of Wisconsin's timely filed petition for review.

## STATUTES AND REGULATIONS

Pertinent statutes are in an addendum to Wisconsin's brief.

## ISSUE PRESENTED

Whether EPA violated the Clean Air Act or acted arbitrarily by failing to prohibit pollution from Illinois, Indiana, Michigan, Missouri, Ohio, and Texas that significantly contributes to nonattainment and interferes with maintenance of the ozone standard in Wisconsin and other downwind states.

## STATEMENT OF THE CASE

### I. STATUTORY BACKGROUND.

The Clean Air Act requires EPA to set national ambient air quality standards for pollutants that endanger public health or welfare, and EPA has designated

ground-level ozone as one such pollutant. 42 U.S.C. §§ 7408, 7409. Ground-level ozone, the main component of smog, is a corrosive air pollutant formed from the reaction of nitrogen oxides and volatile organic compounds in the presence of sunlight. EPA, *Integrated Science Assessment for Ozone and Related Photochemical Oxidants* at ES-2 (Apr. 2020), EPA-HQ-OAR-2021-0668-0078, JA___. Along with damaging plants and ecosystems, *id.* at ES-12–15, JA___-__, ozone causes serious harm to human health, including asthma attacks, permanent lung damage, cardiovascular and metabolic disease, and early death.[1] Groups such as young children, people with lung disease, and older people are particularly vulnerable to these harms.[2] People of color disproportionately bear the burden of these harms.[3]

---

[1] American Lung Association, *State of the Air: 2022 Report* at 24-25 (2022), EPA-HQ-OAR-2021-0668-0270, JA___-___; EPA, *EPA's "Good Neighbor" Plan Cuts Ozone Pollution—Overview Fact Sheet* ("EPA Fact Sheet") at 4 (Mar. 2023), https://www.epa.gov/system/files/documents/2023-03/Final%20Good%20Neighbor%20Rule%20Fact%20Sheet_0.pdf, JA___.

[2] American Lung Association, *supra* note 1, at 25, JA___.

[3] *Id.* at 26 (showing that people of color face higher levels of exposure and suffer from higher incidence of the health conditions that ozone pollution exacerbates), JA___; *see also* EPA, Children's Environmental Health Disparities: Black and African American Children and Asthma at 1, https://www.epa.gov/sites/production/files/2014-05/documents/hd_aa_asthma.pdf (accessed March 25, 2024) (stating that Black children are twice as likely to be hospitalized for asthma as white children and four times as likely to die from asthma), JA___.

EPA first established a standard for ozone in 1971 and has updated it over time. The Act requires these updates: it directs EPA to review air quality standards in regular "five-year intervals" to ensure that they "accurately reflect the latest scientific knowledge ... of all identifiable effects on public health or welfare." 42 U.S.C. §§ 7409(d), 7408(a)(2). EPA adopted the current ozone standard of 70 parts per billion (ppb) in 2015. 80 FR 65,292 (Oct. 26, 2015), JA___.

Under the Act, EPA classifies areas of the country by whether they meet, or how severely they fail to meet, air pollution standards. Where air quality meets a standard, the area is an "attainment" area. 42 U.S.C. § 7407(d). Where air quality fails to meet an air quality standard, the area is a "nonattainment" area. *Id*. And a nonattainment area that subsequently attains the standard is a "maintenance" area. *Nat. Res. Def. Council v. EPA* ("*NRDC*"), 777 F.3d 456, 460 (D.C. Cir. 2014). For ground-level ozone, nonattainment areas are further classified according to the severity of their nonattainment—marginal, moderate, serious, severe, or extreme. *Id.* (citing 42 U.S.C. § 7511(a)(1) & tbl. 1).

Because an area's classification dictates its deadline to attain an ozone standard, 42 U.S.C. § 7511(a)(1) & tbl. 1, the classifications serve the Act's primary goal: timely attainment. *Wisconsin v. EPA*, 938 F.3d 303, 316 (D.C. Cir. 2019) ("attainment … of specified standards within a specified period of time" is the Act's "central object") (quoting *Train v. Nat. Res. Def. Council, Inc.*, 421 U.S.

60, 64 (1975)). In pursuit of that objective, Congress "require[d]" attainment of air quality standards "as expeditiously as practicable and not later than" specified deadlines. *Train*, 421 U.S. at 64-65; 42 U.S.C. § 7511(a)(1) & tbl. 1. For the 2015 standard, most areas were required to attain by 2018 or 2021. *See* 42 U.S.C. § 7511(a)(1) & tbl. 1; EPA, *Summary Table: Nonattainment and Unclassifiable Area Designations for the 2015 Ozone Standards* (Apr. 2018) (classifying most areas as marginal or moderate), https://www.epa.gov/sites/default/files/2018-04/documents/placeholder_1.pdf.

To ensure the Act's substantive requirement of timely attainment is realized, Congress established mandatory procedures and strict timetables for implementation. When EPA sets a standard, states have up to three years to develop a plan to achieve and maintain the standard and submit it to EPA for review and approval. 42 U.S.C. § 7410(a), (k). If a state fails to submit a plan, or EPA disapproves the state's plan, EPA must issue a federal plan for the state within two years. *Id.* § 7410(c)(1).

The Act recognizes that cross-state pollution leads many states to struggle to achieve air quality standards. *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 496 (2014). This pollution imposes an unfair burden on downwind states by harming the health of their residents and forcing those states to make extra cuts—and incur extra costs—to meet air quality standards. *See id.* at 496-97. The Act's

"Good Neighbor Provision" addresses this issue by requiring that implementation plans must "prohibit[]" emissions of any air pollutant in "amounts which will ... contribute significantly to nonattainment" or "interfere with maintenance" of a clean air standard in another state. 42 U.S.C. § 7410(a)(2)(D). This requirement applies to states in the first instance or, when states fail to adopt adequate plans, to EPA. *See EME Homer*, 572 U.S at 496.

In further confirmation of its resolve to achieve healthful air quality, Congress amended the Act multiple times specifically to strengthen the requirements for ozone and cross-state pollution. In response to stubbornly persistent ozone problems, it prescribed a graduated scheme by which areas that persistently fail to attain become subject to increasingly stringent mandatory controls. *South Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882, 886-88 (D.C. Cir. 2006). Congress also strengthened the Good Neighbor Provision to better address "the collective emissions of multiple sources," first by inserting an explicit requirement to reduce emissions, then by expanding the definition of emissions activity subject to the requirement. *EME Homer*, 572 U.S. at 498-99 (quoting S. Rep. No. 101–228, p. 21 (1989), 1990 U.S.C.C.A.N. 3385, 3407).

As amended, the Good Neighbor Provision requires EPA, when it issues a federal plan, to "call for upwind States to *eliminate* their substantial contributions to downwind nonattainment," and their pollution that interferes with maintenance,

"in concert with the attainment deadlines." *Wisconsin*, 938 F.3d at 318 (emphasis added). In EPA's words, "[e]ach downwind state with identified air quality problems has a statutory right to timely relief from the public health and regulatory burdens of upwind pollution."[4]

In enforcing the Provision, EPA must avoid both "over-control" and "under-control." *EME Homer*, 572 U.S. at 522-23. EPA may use relative cost of compliance to determine how to "allocate" needed emissions reductions among upwind polluters, but the obligation to avoid overcontrol and undercontrol limits EPA's discretion to consider cost. *Id.* at 513-14, 518, 521-23. EPA must balance the risks of overcontrol and undercontrol, and in doing so, "some amount of over-control" is to be expected. *Id.* at 523; *see also id.* ("a degree of imprecision is inevitable"). But the Act "requires EPA to seek downwind attainment of [the ozone standard]"—"in *every* downwind state"—"notwithstanding the uncertainties." *Id.* at 522-23. "EPA's task," therefore, "is to reduce upwind pollution" "in 'amounts' that push a downwind State's pollution concentrations above the relevant [air quality standard]." *Id.* at 513-14. *Accord id.* at 515 n.18.

---

[4] EPA, *The EPA's Basis for Partially Denying Petitions for Reconsideration of the Good Neighbor Plan on Grounds Related to Judicial Stays of the SIP Disapproval Action as to 12 States* at 3 (March 27, 2024), https://www.epa.gov/system/files/documents/2024-03/basis-for-partial-denial-of-petitions-for-reconsideration-of-good-neighbo.pdf.

## II. PROCEDURAL BACKGROUND.

### A. Cross-state Pollution Contributes to Violations of the Ozone Standard in Downwind States.

Timely attainment of clean air—the Act's core requirement—has been frustrated by regulatory inaction. Almost nine years after EPA adopted the 70 ppb standard, and after the deadlines that apply in most nonattainment areas have passed, at least 139 million Americans live in areas where ozone levels still exceed the standard.[5] As shown on the map below, violations of the standard persisted throughout the country at the time of this rulemaking.

<u>Figure 1: Monitoring sites violating the 2015 Ozone Standard as of 2022</u>




*Source*: EPA, https://epa.maps.arcgis.com/apps/mapviewer/index.html?layers=7670ef1bbf9e47f786de9e5c428a1eed.

---

[5]*See* EPA, *Nonattainment and Maintenance Area Population Tool: 2015 Ozone*, https://epa.maps.arcgis.com/apps/MapSeries/index.html?appid=7935a00e2554440a8daf6cc035b9455e (last visited Apr. 22, 2024).

Worse, ozone pollution levels are trending the wrong way in many places. EPA ozone monitors in at least fourteen areas not previously designated nonattainment were violating the standard as of 2022, including in Elkhorn, Wisconsin; LaPorte, Indiana; Grand Rapids, Michigan; Toledo, Ohio; Albuquerque, New Mexico; El Paso, Texas; and Denver, Colorado.[6] And in many areas of the country that have long struggled with high ozone levels, air quality improvement has stalled or reversed, as illustrated in the charts and discussion below. *See infra* 18–25.

Pollution from upwind states contributes a "substantial fraction" of the ozone in downwind areas. EPA, Disapproval Response to Comments ("Disapproval RTC") 304 (Jan. 31, 2023), EPA-HQ-OAR-2021-0663-0083, JA___. In Kenosha, Wisconsin, for example, half the ozone blows in from upwind states including Ohio, Texas, Illinois, and Indiana. EPA, Technical Support Document at D-2–8 (June 5, 2023), EPA-HQ-OAR-2021-0668-1157, JA___-___. The upwind-state contribution is even higher —as much as 57%—in Fairfield, Connecticut, another nonattainment area that receives significant pollution from Ohio and Indiana. *Id.*

---

[6] *See* EPA, 2022 Ozone DV Report tbl.2, https://www.epa.gov/system/files/documents/2023-05/O3_DesignValues_2020_2022_FINAL_05_22_23.xlsx, JA___.

Yet states and EPA have neglected their obligation to implement the Good Neighbor Provision for the 2015 ozone standard. First, seven states missed the statutory deadline to submit plans implementing the Good Neighbor Provision for the 2015 ozone standard. 84 FR 66,612 (Dec. 5, 2019), JA___. Then EPA missed the deadline to find that these states failed to submit complete plans, 42 U.S.C. 7410(k)(1)(B), and did so only in response to a Sierra Club lawsuit to enforce the deadline. Complaint, *Sierra Club v. EPA*, No. 1-19-cv-02923 (D.D.C. Sep. 30, 2019). Of the states that did submit plans to EPA, none adopted any actual reductions in pollution; instead, they rested on the status quo regulations from *old* plans. 88 FR 9336, 9354-61 (Feb. 13, 2023), JA___; Disapproval RTC at 436, JA___. EPA missed the statutory deadline to disapprove these do-nothing plans, 42 U.S.C. 7410(k)(2)-(3), and Sierra Club sued again, resulting in another consent decree. *Downwinders at Risk v. EPA*, No. 4-21-cv-3551 (N.D. Cal. May 12, 2021). EPA then disapproved twenty-one states' do-nothing plans in a single, consolidated action in February 2023. 88 FR 9336, JA___. These disapprovals, as well as the previously issued findings of failure to submit, obligated EPA to issue a federal plan implementing the Good Neighbor Provision. 42 U.S.C. § 7410(c)(1).

### B. EPA's Proposed Rule Identifies Downwind Locations That Will Struggle With Elevated Ozone Levels Due to Cross-state Pollution and Fails to Prohibit Sufficient Pollution.

In the proposed Good Neighbor Rule, 87 FR 20,036 (April 6, 2022), JA___, EPA began by cataloguing emissions of ozone precursors and modeling the resulting air quality problems nationwide.[7] EPA focused on 2023 and 2026 because those years coincided with the last full ozone seasons before impending deadlines to attain the ozone standard, and therefore were the last years of data that downwind states could use to demonstrate timely attainment. 88 FR at 36,694, JA___. Based on its modeling for those years, EPA identified downwind locations (which EPA called "nonattainment receptors" and "maintenance receptors") that EPA projected would fail to attain, or struggle to maintain, the ozone standard without better control of cross-state pollution. 88 FR at 36,659, 36,703-04, JA___, ___-___.

Because compliance with the ozone standard is determined on the basis of "design values," EPA defined nonattainment receptors and maintenance receptors in the same terms.[8] EPA defined a "nonattainment receptor" as one currently measuring nonattainment and projected to have an "average design value" above

---

[7] We cite to the final rule instead of the proposal when both take the same approach.

[8] A "design value" is the three-year average of the fourth-highest annual 8-hour average concentration for a given location. 80 FR 65,292 (Oct. 26, 2015), JA___.

the standard in 2023 or 2026. 88 FR at 36,703, JA___. EPA defined a "maintenance receptor" as one projected to have a "maximum design value" above the standard in those years. 88 FR at 36,706, JA___; *accord* 88 FR at 36,703-04 n.158 ("monitoring sites with a maximum design value that exceeds the [ozone standard] are projected to have maintenance problems"), JA___-___ .[9] An "average design value" is the average of three design values projected for a location over a five-year period, while a "maximum design value" is the highest of the three. *Id.* at 36,705, JA___.

EPA then used its modeling to determine which upwind states are "linked" to the downwind air quality problems. Because ozone nonattainment is a "regional-scale, collective contribution problem," EPA considers states to be "linked" to the downwind air quality problem if they contribute pollution above a threshold of one percent of the 70 ppb ozone standard in 2023 or 2026. *Id.* at 36,658, 36,712, JA___, ___. For each nonattainment and maintenance receptor, therefore, EPA identified the upwind states that contribute pollution above that threshold in the relevant year. *Id.* at 36,658, JA___.

[9] EPA sometimes refers to these receptors as "maintenance-only receptors," because, by definition, "nonattainment receptors are also maintenance receptors." 88 FR at 36,704, JA___.

Once EPA identified the contributing states, EPA then addressed the required pollution controls. For each linked state, EPA proposed to limit ozone-forming nitrogen oxide emissions from large power plants, other large industrial polluters (such as gas pipeline engines, cement kilns, and boilers in iron, steel, and paper mills), or both. *Id.* at 36,656-57, JA___. For each category of polluting sources, EPA proposed to require only the pollution reductions it determined "maximized cost-effectiveness." *Id.* at 36,678, JA___.

**i. EPA projects continuing contributions to attainment and maintenance problems with the proposed rule in place.**

The record for the proposed rule made clear that, even when fully implemented, the rule would not prohibit sufficient cross-state pollution to enable downwind attainment. EPA modeled national air quality with the proposed rule in place and calculated that linked upwind states would continue to contribute pollution above the one-percent threshold to continued attainment and maintenance problems in many downwind locations—including Kenosha, Wisconsin; Fairfield, Connecticut; and others—in 2023 and 2026. *See* EPA-HQ-OAR-2021-0668-0758 ("NGO Comments") at 62 (June 21, 2022) (listing receptors and citing EPA, Regulatory Impact Analysis at 3B-9 to 11, tbl. 3B-4 (Feb. 28, 2022), EPA-HQ-OAR-2021-0668-0151, JA___-___; and EPA, Modeling TSD at 16-18, tbl. 3-3 (Feb. 25, 2022), EPA-HQ-OAR-2021-0668-0099, JA___), JA___. The proposal

included a statement that "all possible emissions reductions" had been required "in all cases," without explaining or substantiating that claim. 87 FR at 20,062, JA___.

**ii. Commenters object to undercontrol of cross-state pollution.**

Commenters objected that allowing substantial ongoing upwind-state contributions to downwind attainment and maintenance problems, as the proposed rule did, amounted to unlawful undercontrol. They explained that the Act requires EPA to prohibit such pollution and to do so consistently with downwind areas' attainment deadlines. NGO Comments at 61-65 (citing 42 U.S.C. § 7410(a)(2)(D); *Wisconsin*, 938 F.3d at 318; *EME Homer*, 572 U.S. at 523), JA___-___. Commenters further argued that EPA must comply with the Act unless compliance is "impossible," and that further pollution reduction is achievable from a wide range of sources. NGO Comments at 64, JA___. Commenters pointed out that EPA's boilerplate statement that "all possible emissions reductions" had been required "in all cases" was inadequate to demonstrate impossibility, *id.* (quoting 87 FR at 20,062, JA___), and that, if obtaining sufficient pollution reductions were truly impossible in the timeframe of the rule, EPA would be obligated to require them at the earliest possible date, *id*.

**iii. Commenters object to unrealistically optimistic ozone projections.**

Commenters further pointed out that EPA's ozone pollution projections were implausibly optimistic and actual ozone levels—both in the no-rule baseline and

under the rule—were likely to be even worse than the persistently elevated levels EPA projected. *See* NGO Comments at 29-49, 64, JA___-___, ___. Commenters recounted EPA's track record of over-estimating ozone improvement, described several reasons why EPA's modeling underpredicted real-world ozone levels, and demonstrated the implausibility of EPA's proposed-rule projections by placing them in the context of recent trends in monitored ozone through 2022, which generally showed ozone levels stagnating at levels well above EPA's projections or even increasing. *Id.* 29-49, JA___-___; *see also infra* 18–25 (charts presenting EPA's projections alongside recent monitored ozone levels at multiple downwind receptors).

**C. EPA's Final Rule Does Not Address Or Fix the Undercontrol.**

**i. EPA again projects continuing contributions to attainment and maintenance problems.**

In the final rule, EPA again finds that attainment and maintenance problems will persist with the rule in place. For Wisconsin, EPA projects average design values above the 70 ppb ozone standard—indicating nonattainment—in Sheboygan and maximum design values above the standard—indicating interference with

maintenance—in Sheboygan, Kenosha, and Racine (shown in Table 1; exceedances of the standard in bold[10]).

| Table 1: Wisconsin Projected Ozone Levels Under the Rule[11] | | | | |
|---|---|---|---|---|
| Monitor | 2023 | | 2026 | |
| | Avg | Max | Avg | Max |
| Sheboygan, WI, 551170006 | **72.5** | **73.4** | 70.5 | **71.4** |
| Kenosha, WI, 550590019 | 70.6 | **71.5** | 69.0 | 69.9 |
| Racine, WI, 551010020 | 69.4 | **71.3** | 67.8 | 69.6 |

EPA calculates that elevated ozone levels in Wisconsin will be due in part to continuing contributions above the one-percent threshold from Illinois, Indiana, Michigan, Missouri, Ohio, and Texas, even after full implementation of the rule's controls in 2026.[12] Collectively, those six states contribute 69.9-77.1% of the pollution at the identified Wisconsin nonattainment and maintenance receptors, while Wisconsin's own contribution is just 12.7-18.8%.[13] The contributions from

[10] EPA's policy is to truncate digits after the decimal place, so in practice levels must reach or exceed 71 ppb to violate the 70 ppb standard. 88 FR at 36,705, JA___.

[11] EPA-HQ-OAR-2021-0668-1116 (inputting scenario 4 in cell I2 of tab "summary_DVs_2023," and comparing tabs "2023_scenario_primary" and "23gf_days.2026gf_cntl," rounded to first decimal place), JA___-___; Ozone Transport Policy TSD, EPA-HQ-OAR-2021-0668-1080 at 62 (defining scenarios), JA___; *id.* at 97-98 (describing tabs), JA___-___.

[12] *See* EPA-HQ-OAR-2021-0668-1116, tab "23gf_days.2026gf_cntl," JA___-___.

[13] *See id.* (rounded to first decimal place).

each of Illinois and Indiana exceed the pollution that originates in Wisconsin itself.[14]

EPA projects that pollution from four of the upwind states linked to problem receptors in Wisconsin will also contribute to air quality problems in other downwind states. Specifically, Indiana, Michigan, Ohio, and Texas are modeled to contribute pollution above the one-percent threshold to persistent attainment and maintenance problems in Fairfield County in Connecticut and Eddy, Dona Ana, and Lea counties in New Mexico, as shown in Table 2.

Table 2: Other Projected Ozone Levels Under the Rule[15]

| Monitor | 2023 | | 2026 | |
|---|---|---|---|---|
| | Avg | Max | Avg | Max |
| Fairfield, CT, 90019003 | **73.2** | **73.5** | 70.8 | **71.1** |
| Fairfield, CT, 90013007 | **72.9** | **73.8** | 70.4 | **71.3** |
| Eddy, NM, 350151005 | N/A | N/A | 69.1 | **73.3** |
| Dona Ana, NM, 350130021 | 70.8 | **72.1** | 69.9 | **71.1** |
| Dona Ana, NM, 350130022 | 69.7 | **72.4** | 68.9 | **71.5** |
| Lea, NM, 35025008 | N/A | N/A | 69.2 | **71.6** |

EPA projects contributions between 1.0 and 1.9 ppb to Fairfield County (from each of Indiana, Michigan, and Ohio) and contributions between 1.8 and 4.3 ppb to

[14] Wisconsin's Petitioner brief (at 31) understates the share of total pollution from upwind states at the Sheboygan receptor. Of the 70.5 ppb of ozone projected for Sheboygan, 39.2 ppb comes from anthropogenic U.S. sources (including in Wisconsin), and 27.4 ppb of that, or 69.9%, comes from the linked upwind states. EPA-HQ-OAR-2021-0668-1116, tab "23gf_days.2026gf_cntl," JA___-___.

[15] *Supra* n.11; *see also* Ozone Transport Policy TSD.

Eddy, Dona Ana, and Lea counties (from Texas), all in 2026 after the rule's controls are fully implemented.[16]

In fact, the final rule does not enable *any* downwind areas linked to Illinois, Indiana, Michigan, Missouri, Ohio, and Texas to attain and maintain the standard in 2026. Of the seven receptors linked to those states and projected by EPA as nonattainment or maintenance in 2026 in the absence of a rule, EPA projects that *all seven* will still experience interference with maintenance with the rule in place.[17]

**ii. EPA admits its modeling underpredicts future ozone levels but does not adjust the rule's requirements.**

EPA admits in the final rule that downwind ozone levels will be even worse than the elevated values it projects. According to EPA itself, "the most recent measured ozone values in many areas *strongly suggest that these areas will not likely see the substantial reduction in ozone levels that [EPA's] modeling continue[s] to project*." 88 FR at 36,677, JA___ (emphasis added).

The following charts illustrate how much EPA's projections diverge from reality. They present the monitored design values highlighted in comments in 2022, the much lower design values EPA projected for 2023 and 2026 (in the no-

[16] EPA-HQ-OAR-2021-0668-1116, tab "23gf_days.2026gf_cntl," JA___-___.

[17] *Supra* n.11.

rule baseline), and monitored 2023 design values that post-date the rule and confirm the inaccuracy of EPA's projections.[18] All of the areas depicted in these charts are projected to receive pollution above the one-percent threshold from one or more of Illinois, Indiana, Michigan, Missouri, Ohio, and Texas after implementation of all controls in 2026.[19]

---

[18] All the data used in the figures are EPA's. The 2023 and 2026 projections and the monitored 2021 and 2022 fourth highest ozone values are from EPA-HQ-OAR-2021-0668-1130, JA___-___. The monitored 2023 fourth highest ozone values are from EPA's "Monitor Values Report," available here: https://www.epa.gov/outdoor-air-quality-data/monitor-values-report The 2013-2022 monitored design values are from EPA's "2022 Ozone DV Report," tbl.6, https://www.epa.gov/system/files/documents/2023-05/O3_DesignValues_2020_2022_FINAL_05_22_23.xlsx.

[19] *See* EPA-HQ-OAR-2021-0668-1116, tab "23gf_days.2026gf_cntl," JA___-___.

First, note how the monitored design values for key Wisconsin receptors (shown in blue) are well above EPA's projections (in orange) and trending upwards:









Next, note that monitored design values at key receptors in Connecticut (in blue) exceed EPA's projections (in orange) by even greater margins:






Next, note that key New Mexico receptors likewise record design values well above EPA's projections:






EPA projects all the areas in the above charts to have continued attainment or maintenance problems with the rule in place. *Supra* 15-18. But there are also many areas that EPA projects as attainment for which actual monitored ozone levels and trends indicate that violations are likely to persist. Monitor data and

EPA projections for two such areas are presented below, and charts for more areas are in the addendum. *See* Mammel Decl.

Figure 9: Design Values in Cook County, Illinois (170311601)




Figure 10: Design Values in Porter County, Indiana (181270024)



In addition to agreeing in the final rule that recent monitored ozone trends contradict its projections, 88 FR at 36,677, JA___, EPA quantifies the degree to which its modeling understates real-world ozone levels. According to EPA, the final rule modeling underestimates ozone levels by an average of 6.9 percent in the Upper Midwest, including Wisconsin, and 4.8 percent in the Southwest, including New Mexico. 88 FR at 36,697, JA___. Yet EPA never revises its projections to align them with monitored ozone levels or correct this bias. And when EPA evaluates the rule's impact on air quality, it uses the projections it admits are overly optimistic. 88 FR at 36,697, 36,741, JA___, ___.

**iii. EPA fails to confront the undercontrol problem.**

EPA persists in the final rule in requiring only those pollution reductions that "maximize[] cost-effectiveness," and fails to ensure that this approach does not undercontrol cross-state pollution. 88 FR at 36,678, JA___. In the two sections of the response to comments document that purport to respond to undercontrol objections, EPA fails to explain how continuing upwind-state contributions to downwind attainment and maintenance problems are consistent with the statute. EPA, Response to Public Comments at 346-47, 465 (Mar. 14, 2023), EPA-HQ-OAR-2021-0668-1127, JA___-___, ___. Rather than addressing undercontrol, EPA invokes its extensive *overcontrol* analysis and its determination "that the rule does not overcontrol any states." *Id.* EPA also repeats its boilerplate claim that "all

possible emissions reductions" have been required "in all cases," without claiming that available pollution reductions pointed out by commenters and considered by the agency are impossible—let alone substantiating any such claim—and without adopting further pollution reductions at the time they become possible. 88 FR at 36,694, JA___.

**SUMMARY OF ARGUMENT**

The Good Neighbor Rule undercontrols pollution from Illinois, Indiana, Michigan, Missouri, Ohio, and Texas that contributes to violations of the ozone standard in Wisconsin and other downwind states. EPA itself projects these states will continue to contribute pollution above the threshold of one percent of the 70 ppb standard to areas that will still struggle to maintain the ozone standard after implementation of all controls in 2026. Further, EPA admits its projections underpredict actual ozone levels, and the record shows many downwind areas linked to these six states will remain in nonattainment.

Thus the rule falls short of EPA's statutory obligation to "prohibit[]" pollution "amounts which will ... contribute significantly to nonattainment" or "interfere with maintenance" of the ozone standard. 42 U.S.C. § 7410(a)(2)(D). It also violates EPA's obligation to implement the Good Neighbor Provision "consistent" with the Act's attainment deadlines. *Wisconsin*, 938 F.3d at 318 (applying 42 U.S.C. § 7410(a)(2)(D), 7511(a)). Under the Supreme Court's decision in *EME Homer* and the plain language of the Act, EPA lacks authority to undercontrol cross-state pollution in this way, on cost-effectiveness grounds or any other. *EME Homer*, 572 U.S. at 523; 42 U.S.C. § 7410(a)(2)(D).

EPA also failed to explain how it is consistent with the Act to authorize continued pollution it predicts will interfere with maintenance of the standard, and that its own analysis shows will contribute significantly to nonattainment. And EPA fell far short of substantiating any claim that compliance with the Act is impossible.

Because the rule still achieves pollution reductions that will benefit public health, and because Wisconsin and Sierra Club seek stronger protections, the Court should remand the rule to EPA without vacatur, with instructions to promulgate expeditiously a revised rule that achieves the Act's required pollution reductions.

## STANDING

Sierra Club has standing on behalf of its members, who are exposed to elevated ozone levels where they live, work, and recreate, due in significant part to pollution from upwind states. *See* Declarations; EPA-HQ-OAR-2021-0668-1130, JA___-___. These members suffer harm to their health and a diminished ability to engage in and enjoy recreational and aesthetic interests. *See Friends of the Earth, Inc. v. Laidlaw Env't. Serv. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000).

Because the rule allows upwind states to continue emitting pollution that contributes to elevated ozone levels where Sierra Club members live, work, and recreate, it prolongs and increases these harms. The Court can redress this injury

by remanding the rule to EPA without vacatur. *See, e.g.*, *Sierra Club v. EPA*, 699 F.3d 530, 533 (D.C. Cir. 2012).

## STANDARD OF REVIEW

At issue is whether EPA's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 7607(d)(9)(A). To assess whether EPA complied with the Clean Air Act, the Court enforces the plain text of the statute, using traditional tools of statutory interpretation as needed. *Bluewater Network v. EPA*, 370 F.3d 1, 11 (D.C. Cir. 2004). The Court also reviews whether EPA considered statutory requirements "in a detailed and reasoned fashion," *Rettig v. Pension Ben. Guar. Corp.*, 744 F.2d 133, 151 (D.C. Cir. 1984). "[A]n agency may not trespass beyond the bounds of its statutory authority by taking other factors into account than those to which Congress limited it, nor substitute new goals in place of the statutory objectives without explaining how doing so comports with the statute." *North Carolina v. EPA*, 531 F.3d 896, 919 (D.C. Cir. 2008).

## ARGUMENT

### I. THE RULE VIOLATES THE CLEAN AIR ACT AND IS ARBITRARY BECAUSE IT UNDERCONTROLS CROSS-STATE POLLUTION FROM ILLINOIS, INDIANA, MICHIGAN, MISSOURI, OHIO, AND TEXAS.

#### A. Pollution from These Six States Will Still Significantly Contribute to Nonattainment and Interfere with Maintenance Even After Implementation of All Controls.

EPA found that pollution from Illinois, Indiana, Michigan, Missouri, Ohio, and Texas will interfere with maintenance of the ozone standard in Wisconsin and other downwind states even after implementation of all controls in 2026. EPA's own projections show pollution from these states will contribute more than one percent of the standard to several downwind receptors with maximum design values above the standard, *supra* 15-18, meaning they are "projected [by EPA] to have maintenance problems." 88 FR at 36,704 n.158, JA___.

Of the seven EPA-identified nonattainment and maintenance receptors linked to these states in 2026 in the absence of a rule, EPA projects *all seven* will still experience interference with maintenance due to contributions from those states with the rule in place. *Supra* 18. And because EPA agrees its projections understate ozone pollution, *supra* 25, the degree and extent of interference with maintenance is likely to be greater than projected.

While EPA's modeling does not record any of the receptors linked to these states as nonattainment in 2026, the modeling understates ozone levels by more

than enough to incorrectly classify many nonattainment areas as attainment. If EPA had adjusted its projections to account for the 6.9 and 4.8 percent downward bias EPA found in its own modeling of the Upper Midwest and the Southwest, respectively, 88 FR at 36,697, JA___, all the areas in Table 3 would be in nonattainment even after implementation of all controls in 2026.

| Table 3: Adjusted Average Design Values | | |
|---|---|---|
| Monitor | 2026 Avg DV | 2026 Adjusted Avg DV |
| Sheboygan, WI, 551170006 | 70.5 | **75.4** |
| Kenosha, WI, 550590019 | 69 | **73.8** |
| Racine, WI, 551010020 | 67.8 | **72.5** |
| Dona Ana, NM, 350130021 | 69.9 | **73.3** |
| Eddy, NM, 350153001 | 69.6 | **72.9** |
| Lea, NM, 350250008 | 69.2 | **72.5** |
| Eddy, NM, 350151005 | 69.1 | **72.4** |
| Dona Ana, NM, 350130022 | 68.9 | **72.2** |

**B. This Undercontrol of Cross-state Pollution Violates the Act.**

Because EPA found ongoing cross-state pollution will interfere with maintenance of the ozone standard, and the record shows cross-state pollution will contribute significantly to nonattainment, EPA was required to "prohibit[]" it. 42 U.S.C. § 7410(a)(2)(D). EPA's refusal to do so contravenes the unambiguous

mandate of the Good Neighbor Provision. *Id.*; *accord EME Homer*, 572 U.S. at 523 (EPA has a "statutory obligation" to avoid "under-control").

Further, authorizing continued cross-state contributions to nonattainment and non-maintenance violates the Act's "central" requirement—attainment of the ozone standard "as expeditiously as practicable" and not later than fixed deadlines. 42 U.S.C. § 7511(a); *Sierra Club v. EPA*, 294 F.3d 155, 161 (D.C. Cir. 2002) (quoting *Union Elec. Co. v. EPA*, 427 U.S. 246, 258 (1976)); *Train*, 421 U.S. at 66-67. As this Court has already held, the Good Neighbor Provision requires EPA to control cross-state pollution "consistent" with the deadlines for attainment. *Wisconsin*, 938 F.3d at 318 (applying 42 U.S.C. § 7410(a)(2)(D), 7511(a)). That is, it requires EPA to "call for upwind States to eliminate their substantial contributions to downwind nonattainment," and their pollution that interferes with maintenance, "in concert" with the deadlines. *Wisconsin*, 938 F.3d at 318. It thus violates the Act to allow such contributions to persist beyond the applicable deadlines for attainment.

Nor does EPA have statutory authority to decline to require pollution reductions necessary for attainment and maintenance. In *EME Homer*, the Supreme Court held that the Good Neighbor Provision bars EPA from using cost-effectiveness either to overcontrol cross-state pollution or undercontrol it, and approved the use of cost-effectiveness only to "allocate" necessary reductions

among contributing upwind polluters. 572 U.S. at 513-14, 522-23. Focusing its analysis on the statutory term "amounts," the Court held that "EPA's task is to reduce upwind pollution" "in 'amounts' that push a downwind State's pollution concentrations above the relevant [clean air standard]." *Id.* at 513-14 (quoting 42 U.S.C. § 7410(a)(2)(D)). Accordingly, EPA is "constrained" by the statute to eliminate "those amounts that 'contribute to ... nonattainment'" and, under the provision's maintenance prong, to reduce pollution by "just enough to permit an already-attaining State to maintain satisfactory air quality." *Id.* at 515 n.18 (alteration in opinion; emphasis removed).

The Court's determination that the Good Neighbor Provision requires these pollution reductions reflects a straightforward application of the statutory language. The Good Neighbor Provision's clear mandate to EPA to "prohibit[]" emissions of any air pollutant in "amounts which will ... contribute significantly to nonattainment," 42 U.S.C. § 7410(a)(2)(D), leaves no room for EPA to authorize substantial contributions to nonattainment, on cost-effectiveness grounds or any other. Indeed, not one justice in *EME Homer* approved EPA's claim that "contribute significantly" imparts authority to privilege cost-effectiveness over obtaining the necessary pollution reductions. 572 U.S. at 522-23 (holding that the Act's constrains EPA's authority by barring overcontrol and undercontrol); *id.* at

525 (Scalia, J., dissenting) (rejecting as "feeble" EPA's claim that the phrase "significantly contribute" imparts such authority).

The command to prohibit pollution that interferes with maintenance, which lacks even the modifier "significantly," 42 U.S.C. § 7410(a)(2)(D), confirms that EPA's authority to use cost-effectiveness is limited. The maintenance prong is a binding statutory requirement to which EPA must give "independent significance." *North Carolina*, 531 F.3d at 910-11. Nothing in the command to prohibit pollution "amounts" that "interfere with maintenance" permits EPA to decline to do so on cost-effectiveness grounds.

Likewise, EPA's preference to maximize cost-effectiveness cannot justify acting inconsistently with the attainment deadlines for downwind states. Those deadlines—the "heart" of the Act, *Train*, 421 U.S. at 66-67—"leave no room for claims of technological or economic infeasibility." *NRDC*, 777 F.3d at 468 (quoting *Sierra Club*, 294 F.3d at 161); *see also North Carolina*, 531 F.3d at 911-13 (rejecting EPA's attempt to delay good neighbor reductions based on "reasons of feasibility"); *Wisconsin*, 938 F.3d at 319 (same).

### C. EPA Unreasonably and Arbitrarily Failed to Heed the Statutory Mandate to Avoid Undercontrol.

EPA's implementation of the Good Neighbor Provision is also unreasonable and arbitrary because EPA failed to explain how ongoing contributions to downwind attainment and maintenance problems "comport[] with the statute."

*North Carolina*, 531 F.3d at 909. *See Rettig*, 744 F.2d at 151 (agency must consider statutory requirements "in a detailed and reasoned fashion"). As noted above, EPA itself projected pollution from states linked to Wisconsin will continue to interfere with maintenance at multiple downwind locations after all controls have been implemented and *agreed* actual ozone levels are likely to be even higher. *Supra* 15-25. EPA even calculated underprediction factors for modeling of ozone in the Upper Midwest and Southwest that confirm widespread nonattainment will likely persist. *Id.* Yet EPA failed to reconcile these findings with its obligations under the Good Neighbor Provision, including its obligations to avoid undercontrol and to implement the provision consistent with the attainment deadlines. *See Mountain Commc'ns, Inc. v. FCC*, 355 F.3d 644, 648-49 (D.C. Cir. 2004) (pronouncing action arbitrary where agency had "not even tried to explain how its position [could] be reconciled with the statutory provision").

Nothing in EPA's discussion of continuing cross-state contributions to downwind attainment and maintenance problems explains how they "comport[] with" the Good Neighbor Provision or the attainment deadlines. *North Carolina*, 531 F.3d at 909. EPA cites air quality "improvement," 88 FR at 36,741, JA___, but does not claim that mere "improvement" is sufficient, let alone reconcile any such claim with the statutory requirement to *eliminate* significant contributions to nonattainment and interference with maintenance. *Wisconsin*, 938 F.3d at 313;

*North Carolina*, 531 F.3d at 908 ("Because [the rule] is designed as a complete remedy to section 110(a)(2)(D)(i)(I) problems, ... it must actually require elimination of emissions from sources that contribute significantly and interfere with maintenance."). Nor does EPA justify continued reliance on projected improvements it agrees are unrealistic. *See Nat'l Ass'n of Clean Water Agencies v. EPA*, 734 F.3d 1115, 1145 (D.C. Cir. 2013) (declining to "rubber-stamp" EPA's approach when the results "demonstrate[d] flaws in the formula").

Indeed, even after commenters objected that continued upwind-state contributions to downwind attainment and maintenance problems constitute unlawful undercontrol, EPA still failed to explain how the rule is consistent with the bar on undercontrol. *Supra* 25. EPA pointed instead to its extensive analysis showing the rule does not *overcontrol* pollution. *Id.* EPA's failure to respond to comments confirms that its statutory approach is unreasonable and "demonstrates that [its] decision was not based on a consideration of the relevant factors." *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012).

**D. Compliance with the Act is Not "Impossible."**

Nor can EPA carry the "heavy burden to demonstrate the existence of an impossibility," *Wisconsin*, 938 F.3d at 319 (quoting *Sierra Club v. EPA*, 719 F.2d 436, 462 (D.C. Cir. 1983)), simply by asserting in a single sentence of the rule preamble that "all possible emissions reductions" have been required "in all cases."

88 FR at 36,694, JA___. EPA's omnibus claim is devoid of explanation, substantiation, or support in the record. Even after commenters pointed out that many additional pollution reductions are achievable and objected that a single unexplained sentence is insufficient to carry EPA's burden, *supra* 14, EPA repeated the sentence in the final rule, again without any record explanation, substantiation, or support. Thus, as in *Wisconsin*, EPA "has not attempted to meet" its heavy burden to show it should be excused from compliance with the Act. 938 F.3d at 319.

Further, any true impossibility would still not justify the rule. EPA's non-compliance with its legal obligations must be limited to that which is impossible. Otherwise, EPA could impermissibly "seize on a remedy made available for extreme illness and promote it into the daily bread of convenience." *Am. Hosp. Ass'n v. Price*, 867 F.3d 160, 168 (D.C. Cir. 2017). Thus, if EPA had adequately justified delaying needed emission reductions beyond 2026 on grounds of impossibility, EPA would have to require them at the time they become possible, but it has not.

## II. THE RULE SHOULD BE REMANDED TO EPA WITHOUT VACATUR.

The Court should remand the rule to EPA without vacatur to "preserve the environmental values" it protects. *North Carolina v. EPA*, 550 F.3d 1176, 1178 (D.C. Cir. 2008). In general, this Court "do[es] not vacate regulations when doing

so would risk significant harm to the public health or the environment." *Wisconsin*, 938 F.3d at 336 (citing *Allied-Signal v. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)).

Although the rule should be stronger, it provides enormous health benefits. If fully implemented, EPA estimates that in 2026 alone, it will "prevent approximately 1,000 premature deaths, 2,400 hospital and emergency room visits, 1.3 million cases of asthma symptoms, and 470,000 school absence days."[20] Children and other vulnerable populations will benefit most. Vacatur would erase these benefits of cleaner air, frustrating the Act's core purpose. *See North Carolina*, 550 F.3d at 1178; *Wisconsin*, 938 F.3d at 336. Moreover, vacating the Rule would defeat Petitioner Wisconsin and Petitioner-Intervenor Sierra Club's purpose in bringing suit—reduced air pollution. *See Env't Def. Fund, Inc. v. EPA*, 898 F.2d 183, 190 (D.C. Cir. 1990) (declining to vacate where doing so "would at least temporarily defeat petitioner's purpose, the enhanced protection of the environmental values covered by the [statute].").

For these reasons, the Court should follow the course it has taken on review of prior cross-state air pollution rules and leave the Rule in place during the remand. *See, e.g.*, *Wisconsin*, 938 F.3d at 336-37 (remanding cross-state air

[20] EPA Fact Sheet 4, https://www.epa.gov/system/files/documents/2023-03/Final%20Good%20Neighbor%20Rule%20Fact%20Sheet_0.pdf.

pollution rule without vacatur); *EME Homer City Generation, L.P. v. EPA*, 795 F.3d 118, 132 (D.C. Cir. 2015) (same); *North Carolina*, 550 F.3d at 1178 (same).

Further, the Court should direct EPA to act expeditiously on remand. *See Delaney v. EPA*, 898 F.2d 687, 695 (9th Cir. 1990) (providing six-month timeline for promulgation of a FIP). Most downwind areas have already missed their deadlines to attain the 2015 ozone standard and face a continuing obligation to attain "as expeditiously as practicable." 42 U.S.C. § 7511(a)(1). And EPA must align its implementation of the Good Neighbor Provision with the timeframes for downwind attainment. *Wisconsin*, 938 F.3d at 318.

## CONCLUSION

For the foregoing reasons, the Court should remand the Good Neighbor Rule to EPA, without vacatur, with instructions to promulgate expeditiously a revised rule that achieves the pollution reductions required by the Act.

Dated: April 22, 2024

Respectfully submitted,

/s/ Zachary M. Fabish
Zachary M. Fabish
Sierra Club
50 F Street NW, 8th Floor
Washington, DC 20001
650-388-8446
zachary.fabish@sierraclub.org

Joshua D. Smith
Sierra Club
2101 Webster Street, Suite 1300

/s/ Neil Gormley
Neil Gormley
Kathleen L. Riley
Seth L. Johnson
Earthjustice
1001 G Street NW, Suite 1000
Washington, DC 20001
202-797-5239
202-745-5227
202-797-5245
ngormley@earthjustice.org

Oakland, CA 94612
415-977-5560
415-977-5704
joshua.smith@sierraclub.org

*Counsel for Sierra Club*

kriley@earthjustice.org
sjohnson@earthjustice.org

*Counsel for Sierra Club*

**CERTIFICATE TOF COMPLIANCE WITH TYPE-VOLUME LIMIT**

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), D.C. Circuit Rule 32(e)(2)(C), and the Court's December 3, 2023, and January 4, 2024, Orders establishing the briefing format, counsel hereby certifies that the foregoing Proof Opening Brief of Petitioner-Intervenor Sierra Club contains 6,913 words, as counted by counsel's word processing system, and thus complies with the 7280-word limit. This document further complies with the typeface and type-style requirements of the Federal Rules of Appellate Procedure, 32(a)(5) and (a)(6), because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 using size 14 Times New Roman font.

Dated: April 22, 2024

*/s/ Neil Gormley*
Neil Gormley